(No. 28023.—

PETER F. ZELNEY, doing business as Triangle Motorcycle Package Service, Appellant, *vs.* FRANCIS B. MURPHY, Director of Labor, *et al.,* Appellees.

*Opinion filed September 19, 1944.*

Alfred F. Beck, of Chicago, for appellant.

George F. Barrett, Attorney General, (William C. Wines, of Chicago, of counsel,) for appellees.

Mr. Justice Thompson delivered the opinion of the court:

Appellees, Robert Robey and George W. Katana, hereinafter referred to as claimants, filed individual claims with the Department of Labor, for unemployment compensation under the provisions of the Illinois Unemployment Compensation Act, claiming they were in the employ of Peter F. Zelney, doing business as Triangle Motorcycle Package Service. The claims were consolidated on hearing and appellant, Zelney, seeks review of a judgment of the circuit court of Cook county, quashing the writ of *certiorari* and affirming the decision of the board of review and the Director,

finding that Robert Robey and George W. Katana were in the employ of appellant and so entitled to unemployment compensation.

Appellant contends that the Unemployment Compensation Act (Ill. Rev. Stat. 1943, chap. 48, par. 217 *et seq.,*) is invalid for reasons set out in his brief, and that the record does not sustain the findings of the Department of Labor that Robey and Katana were employees of appellant, Zelney.

The facts show that Peter F. Zelney, doing business as Triangle Motorcycle Package Service, operated a motorcycle package delivery service in the city of Chicago. An over-all picture of the operation of the business reveals that Zelney maintained an office with telephone service and advertised in the Chicago classified telephone directory, commonly known as the Red Book, "giving just the name [Triangle Motorcycle Package Service] and special delivery motorcycles." In furnishing this service Zelney engaged the owners of certain motorcycles among whom were the claimants, Robey and Katana, who drove and owned their own motorcycles, furnished and paid for their own licenses, gas and oil. Zelney owned the business, kept the books, furnished an office, telephone service, receipt forms, and rate cards setting forth the fees to be charged customers for various services. The fees for the services rendered were divided between Zelney and the motorcycle drivers, seventy per cent going to the drivers and thirty per cent to Zelney. Zelney, after receiving a telephone call from a customer that a package was to be picked up and delivered, called one of the drivers, who had reported to his office for such service, giving him the name and location of the customer. The driver then answered the call for the pickup, received from the customer his instructions concerning the delivery, delivered same and took a receipt therefor which he turned in to the office maintained by Zelney, with a notation thereon of the service. For this

service the customer was billed by Zelney. To expedite the handling and delivery of packages and to eliminate duplication by the drivers, they sometimes brought packages to Zelney's office where they dumped them in a pile on the floor of a garage which belonged to Zelney, putting the receipts corresponding thereto in a basket. When a call for a pickup came in, the driver whose turn it was to answer the call would look over the tickets and sort out from the pile the corresponding packages to be delivered in the vicinity of the pickup. The pickups were free. The driver received the seventy per cent only on deliveries but it evened itself up. Mrs. Zelney, wife of appellant, who worked in the office, answered the telephone and kept the books, often sorted the tickets of packages to be delivered in the same vicinity of the pickups. The drivers frequently delivered C.O.D. packages and in such cases the money received was all turned over to Zelney without deduction by the driver of any part of his fee. Zelney would then deduct the whole fee upon remitting to the customer. The business, as built up by Zelney, consisted of customers who were steady and regular and most of them were carried on open account, Zelney billing them for services rendered. The drivers were paid their share of the earnings at the end of each week by Zelney, who assumed the risk of non-collection.

The evidence discloses that Robey and Katana were at liberty to do work for other persons but never did. Their entire time was taken up in deliveries and pickups for the Triangle Motorcycle Package Service, operated by Zelney. Neither was under written contract although some of the others were so engaged. There were no set starting, working, or quitting hours. The drivers, however, usually reported for work between eight and nine o'clock in the morning at the office of Zelney.

It is urged by appellant the claimants are independent contractors within the meaning of the Illinois Unemploy-

ment Compensation Act and not employees of appellant; that the act is unconstitutional both under the State and Federal constitutions. As to the constitutional questions involved, it is contended that the disbursements of contributions made to the Director of Labor, being public funds, violates section 16, 17 and 20 of article IV of the State constitution. This question was not presented to the trial court and on appeal will not be considered. It is a well-settled rule that a constitutional question cannot be presented in this court for review unless it was presented to the lower court for its determination. The rule applies in cases of this kind. The record of the circuit court must disclose in some manner that such a question was presented to it for its determination before it can be raised in this court. *Odin Coal Co.* v. *Industrial Com.* 297 Ill. 392; *Savoy Hotel Co.* v. *Industrial Board,* 279 Ill. 329.

It is contended by appellant that contributions under the Unemployment Compensation Act cannot be sustained as taxes and that under sections 1 and 2 of article IX, of the State constitution, the legislature is restricted to taxation for revenue only and to three classes of taxes. The three classes are: (1) property taxes on a valuation basis; (2) occupation taxes; and (3) franchise or privilege taxes. All property taxes must be *ad valorem.* All other taxes must be uniform. The cases of *Bachrach* v. *Nelson,* 349 Ill. 579, and *Winter* v. *Barrett,* 352 Ill. 441, are cited in support of this proposition.

If it could be said that this is a taxing statute there would be some merit to appellant's contention. However, in the case of *Zehender & Factor, Inc.* v. *Murphy,* 386 Ill. 258, at page 262, this court said: "The Unemployment Compensation Act declares its policy and moving purpose to be to alleviate the evils flowing from widespread unemployment and to provide benefits to those workers coming within the act as at least a partial reimbursement for loss of income during periods of unemployment. Section 23(a)

of the act (Ill. Rev. Stat. 1943, chap. 48, par. 240,) provides that the money collected under the act shall be kept separate and apart from all public monies of the State by the State Treasurer, who is made the custodian thereof, and that the act shall be administered by the Director of Labor exclusively for the purpose of the act. In *Oak Woods Cemtery Ass'n* v. *Murphy*, 383 Ill. 301, this court declared this statute to be an exertion of the police power of the State, holding that relief of unemployment is a public purpose and that the act is remedial. On this same principle it has been held that acts which may be regarded as enacted in the interest of public welfare and providing for assistance of the unemployed, are entitled to receive liberal interpretation. (*Maine Unemp. Comp. Com.* v. *Androscoggin*, 137 Me. 154, 16 Atl. 2d 252; *New Haven Metal & Heating Co.* v. *Danaher*, 128 Conn. 213, 21 Atl. 2d 383; *Young* v. *Bureau of Unemp. Comp.* 63 Ga. App. 130, 10 S. E. 2d 412; *Singer Sewing Machine Co.* v. *State Unemp. Comp. Com.* 167 Ore. 142, 116 Pac. 2d 744.) Illinois remedial legislation has heretofore been regarded as entitled to liberal construction even though it requires involuntary contributions to maintain it. *Grand Trunk Western Railway Co.* v. *Industrial Com.* 291 Ill. 167; *Chicago, Wilmington & Vermilion Coal Co.* v. *People,* 181 Ill. 270; *Consolidated Coal Co.* v. *Illinois,* 185 U. S. 203, 46 L. ed. 872.

"While we are not inclined to quibble over the distinction between contributions and the assessment of payments, we are of the opinion that the amounts required to be paid do not come within the classification of general taxation, and that the statute is not a taxing statute and is entitled to liberal construction to the end that its purposes may be met."

It is urged that the State may not take private property nor money for a private use and that the act as a whole violates sections 1, 2, 13 and 20 of article II of the State

constitution and section 1 of the fourteenth amendment to the Federal constitution; and the case of *People* v. *Chicago, Milwaukee and St. Paul Railway Co.* 306 Ill. 486, is cited in support of such contention. The statute there, as questioned, provided a penalty for any employer who made a deduction in wages for a period of two hours used by such employee in voting at any general or special election and the court held that it was not the constitutional right of any citizen to be paid for the time consumed in exercising the right to vote. The court further said: " 'No exercise of the police power can disregard the constitutional guaranties in respect to the taking of private property, due process and equal protection' of the laws." This holding was approved in *McAlpine* v. *Dimick*, 326 Ill. 240. However, this statute, re-enacted and amended from time to time, still contains this provision providing for the right of any citizen to be paid for the time consumed in exercising his right to vote. These cases, of course, could not be controlling as to the statute under consideration here and especially in view of the growing appreciation of public needs and of the necessity of finding ground for a rational compromise between individual rights and public welfare. The growing complexity of our economic interests has inevitably led to an increased use of regulatory measures in order to protect the individual so that the public good is reassured by safeguarding the economic structure upon which the good of all depends.

This court, in the case of *People* v. *Johnson*, 288 Ill. 442, said: "The police power of a State is an attribute of sovereignty and exists without any reservation in the constitution, being founded on the duty of the State to protect its citizens and provide for the safety and good order of society. The mere fact that a law restrains the liberty of citizens of a State does not render it unconstitutional. In *Hawthorn* v. *People*, 109 Ill. 302, we discussed at length the powers of the legislature, and an elaborate repetition

of that discussion would serve no good purpose here. We have held in a long line of decisions, where the authorities have been collected and discussed, that it is for the legislature to determine when the conditions exist calling for the exercise of police power to meet existing evils, and when the legislature has acted the presumption is that the act is a valid exercise of such power. *People* v. *Stokes,* 281 Ill. 159; *People* v. *Henning Co.* 260 id. 554; *People* v. *Ellerding,* 254 id. 579."

In passing upon a statute, enacted under the police power, this court will not search for reasons to hold an act invalid. On the contrary, he who challenges the constitutionality of a legislative act has the burden of clearly showing wherein the act violates the constitution. Every presumption is in favor of the validity of the act. (*Fenske Bros., Inc.* v. *Unholsterers Int. Union,* 358 Ill. 239; *People* v. *Anderson,* 355 Ill. 289; *Reif* v. *Barrett,* 355 Ill. 104; *Hunt* v. *Rosenbaum Grain Corp.* 355 Ill. 504; *People* v. *City of Chicago,* 349 Ill. 304.) The Unemployment Compensation Act is an exertion of the police power of the State, the relief of unemployment being a public purpose in which the people of the State have a paramount interest. *Oak Woods Cemetery Ass'n* v. *Murphy,* 383 Ill. 301; *Carmichael* v. *Southern Coal Co.* 301 U. S. 495.

Courts and law writers have found it difficult to find the extent and boundaries of "police power." It certainly extends to the protection of the lives, health and property of the citizens and to the preservation of good order and public morals. Legislation under the police power of the State is not confined to public health, safety or morality, but may extend to matters in the interest of the public welfare or convenience. (*Clarke* v. *Storchak,* 384 Ill. 564; *State* v. *Bassett,* 100 Conn. 430, 123 Atl. 842, 37 A. L. R. 131.) A large discretion is necessarily vested in the legislature to determine not only what the interests of public convenience and welfare require, but what measures are

necessary to secure such interest. *Clarke* v. *Storchak,* 384 Ill. 564; *Cotter* v. *Stockel,* 97 Conn. 239, 116 Atl. 248; *Silver* v. *Silver,* 108 Conn. 371, 143 Atl. 240.

It is well settled that the legislature may, in the exercise of the police power of the State, enact those measures which have a tendency to promote the public comfort, health, safety, morals or welfare of society. (*Fenske Bros., Inc.* v. *Upholsterers Int. Union,* 358 Ill. 239; *Massie* v. *Cessna,* 239 Ill. 352; *Condon* v. *Village of Forest Park,* 278 Ill. 218.) The police power is considered capable of development and modification within certain limits, so that the powers of governmental control may be adequate and meet changing social and economic conditions. The power is not circumscribed by precedents arising out of past conditions but is elastic and capable of expansion in order to keep pace with human progress. It is not a fixed quantity, but it is the expression of social, economic and political conditions. (*Fenske Bros., Inc.* v. *Upholsterers Int. Union,* 358 Ill. 239; *People* v. *Rosehill Cemetery Co.* 334 Ill. 555; *Public Utilities Com. ex rel. Quincy Railway Co.* v. *City of Quincy,* 290 Ill. 360.) In the exercise of this power the legislature may enact laws regulating, restraining or prohibiting anything harmful to the welfare of the people, even though such regulation, restraint or prohibition interferes with the liberty or property of an individual. Neither the fourteenth amendment to the Federal constitution nor any provision of the constitution of this State was designed to interfere with the police power to enact and enforce laws for the protection of the health, peace, morals or general welfare of the people. *Fenske Bros., Inc.* v. *Upholsterers Int. Union,* 358 Ill. 239; *Powell* v. *Pennsylvania,* 127 U. S. 678, 31 L. ed. 253; *People* v. *Anderson,* 355 Ill. 289; *Town of Cheney's Grove* v. *VanScoyoc,* 357 Ill. 52.

The case of *Ross* v. *Irving,* 14 Ill. 171, cited by appellant and announced by this court in 1852, affords but

little help in determining the correctness of legislative acts passed under the constitution of 1870, especially when the enacting statute is within the police power of the State. The act, as a whole, does not violate sections 1, 2, 13 and 20 of article II of the State constitution or section 1 of the fourteenth amendment to the Federal constitution.

It is contended by Zelney that Robey and Katana were not in his employment as contemplated by the act, but were independent contractors; that if it be determined that the latter relationship existed, section 2(f)(5) of the act is not applicable. It is further contended that if it be determined that they were employees, then it would be necessary to determine whether or not, as such, they were exempted under subparagraphs (A), (B) and (C) of paragraph (f)(2) of that section.

It is urged by appellant that the claimants Robey and Katana, and the Department of Labor, have failed to establish that the relationship of employer and employees existed or that appellant, Zelney, was an employing unit. This court, in *Ozark Minerals Co.* v. *Murphy*, 384 Ill. 94, at page 101, made this pertinent statement: "The act, however, defines 'employers' or 'employing units' and 'employment,' as those terms are used in the act. The act was adopted to alleviate the stress of unemployment, and this court held in *Miller, Inc.* v. *Murphy*, 379 Ill. 524, that the act rather than the common-law concept of master and servant governs that relationship."

Section 2(d) of the Unemployment Compensation Act defines "employing unit" to mean any individual or type of organization, including any partnership, association, trust, estate, joint-stock company, insurance company or corporation, whether domestic or foreign, or the receiver, trustee in bankruptcy, trustee or successor thereof, or the legal representative of a deceased person, which has or subsequent to January 1, 1936, had in its employ one or more individuals performing services for it within this State.

The remaining provisions of subsection (d) do not in any way detract from the definition given "employing unit." The following provisions of said section, "Whenever any employing unit contracts with or has under it any contractor or subcontractor for any work which is part of its usual trade, occupation, profession, or business, unless such contractor or subcontractor at the same time that he is performing work for such employing unit, performs work or is in fact actually available to perform work for anyone who may wish to contract with him, and is also found to be engaged in an independently established trade, business, profession, or enterprise, or unless the employing unit as well as each such contractor or subcontractor is an employer by reason of Section 2, subsection (e), or Section 3, subsection (c) of this Act, the employing unit shall for all the purposes of this Act, be deemed to employ each individual in the employ of each such contractor or subcontractor for each day during which such individual is engaged in performing such work," affect only employees of contractors or subcontractors not coming within the exceptions.

It is further provided in said subsection that if such contractor or subcontractor is an employer by reason of subsection (e) of section 2, or subsection (c) of section 3, he alone shall be liable to contribute to the fund or account of such employees measured by the wages of the individuals in his employment. These provisions, including those quoted in the above paragraph, were intended to make certain that the employees of contractors and subcontractors would be within the provisions of the act and entitled to its benefits either as employees of the contractor or subcontractor as employing units, or as the employees of the employing unit who engaged the contractor or subcontractor to perform the services.

Under section 2(f)(1), (Ill. Rev. Stat. 1939, chap. 48, par. 218,) pertinent here, employment means services by

an individual for an employing unit. The primary question is whether claimants were employees under the act, or independent contractors and therefore not controlled by its provisions.

Appellant contends that a comparison of the facts of the case at bar with other cases recently decided by the court, brings out the nonliability of Zelney. It is urged that in the case of Ozark Minerals Company, the miners worked on the land of the company which paid them and similarly in the case at bar the drivers worked on the streets of Chicago and were paid by the customer; that the Ozark Minerals Company furnished all tools and equipment, while Zelney furnished nothing except some receipt forms. Analysis of the facts in the *Ozark case* reveal their dissimilarity from the instant case. The miners and prospectors in the *Ozark case* were not only available to perform work for anyone who might wish to contract with them, but each of them was engaged in other work such as farming, gardening and other independent employment except such time as they chose to devote to mining and prospecting, and they were not under the direction or control of the Ozark Minerals Company but did their work as they saw fit to do it. In many other ways the facts as shown by the *Ozark case* are not similar. In the instant case the evidence discloses the employees of Zelney, including Robey and Katana, reported to the office of Zelney each morning around eight thirty or nine o'clock. They did not, as the evidence shows, perform any other service and were not engaged in any other business. They were directed by the appellant, who procured business over the telephone, to go to certain designated places for the purpose of picking up packages. Certainly, they were under the control and went to such destinations on instructions and directions of appellant. Mrs. Zelney, wife of appellant, who handled the telephone for appellant and received calls, testified that packages brought in by drivers were left on

the floor; that the receipts for the packages were left in a basket and if a driver was going a certain way he would go through the basket and pick out what was going his way; that if she had more time than a driver she would pick out the stops going his way. Zelney furnished the rate cards fixing the fees to be charged by drivers. He billed the customers of his business for services rendered and assumed the risk of noncollection. Many other facts disclose means of control and direction by appellant.

We think this case, on the facts, is similar to the case of *Rozran* v. *Durkin*, 381 Ill. 97. There, one Kuehl was in the employ of the Cannonball Bonded Messenger Service. He made deliveries for Cannonball under an oral agreement, by the terms of which he was to receive 65 per cent of the gross revenue received for the delivery of the packages. He was not required to report to the company at any particular day or at any particular time of the day, but the evidence shows that he reported every morning early, with the exception of a few mornings when he was snowbound. He was given packages to deliver, which packages were delivered to various points in the city of Chicago and suburbs. Kuehl was at liberty to do trucking for other purposes but never did, as his entire time was taken up in deliveries and pickups for Cannonball. It is true that in the *Rozran case* there was a dispatcher for Cannonball, but we see no material difference in that respect in the duties of the dispatcher and Mrs. Zelney handling and batching the parcel tickets and assigning them to the drivers for delivery. It is evident the claimants were employees under the act and not independent contractors.

Appellant contends that even where the relationship of employer and employee exists the employment is outside the act if it falls within the exceptions in section 2(f)(5) thereof. This act, as it existed during the time here involved, provided: "Services performed by an individual shall be deemed to be employment subject to this Act un-

less and until it is shown to the satisfaction of the Director that—(A) Such individual has been and will continue to be free from control or direction over the performance of such services, both under his contract of service and in fact; and (B) Such service is either outside the usual course of the business for which such service is performed or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and (C) Such individual is engaged in an independently established trade, occupation, profession or business." Ill. Rev. Stat. 1939, chap. 48, par. 218, p. 1614.

In order to come within these exceptions the person rendering services for another must be (A) "free from control or direction over the performance of such services, both under his contract of service and in fact." (B) It must appear that the service was "either outside the usual course of the business for which such service is performed or that such service is performed outside of all the places of business of the enterprise for which such service is performed." (C) The person performing the service must be "engaged in an independently established trade, occupation, profession or business."

In order to except one rendering services for another from the operation of the act, he must come within all three of the above exceptions. All of the conditions creating the exceptions must concur. (*Miller, Inc.* v. *Murphy,* 379 Ill. 524.) From the facts as shown herein we do not think it can reasonably be said that the claimants in this case came within either of the exceptions named in the act. The record shows that the appellant was clearly liable for the assessment.

The judgment of the circuit court of Cook county, which affirmed the ruling of the board of review, is correct and it is affirmed. *Judgment affirmed.*